H. H. MONDRAGON and Robert
Jaramillo, Appellants,

v.

Juan TENORIO et al., Appellees.

No. 74–1504.

United States Court of Appeals,
Tenth Circuit.

Argued March 26, 1975.

Decided May 9, 1977.

**424**

Vilma S. Martinez and Sanford J. Rosen, San Francisco. Cal., Charles T. Dumars and Richard C. Bosson, Albuquerque, N.M., Mexican American Legal Defense and Educational Fund, and Michael B. Browde, Albuquerque, N.M., of counsel, for appellants.

John B. Tittmann, Keleher & McLeod, Albuquerque, N.M., Roberto C. Armijo, Las Vegas, N.M., and Roberto L. Armijo, Las Vegas, N.M., of counsel, for appellees.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

SETH, Circuit Judge.

The appellants commenced this action under 42 U.S.C. § 1983 asserting that they have been discriminated against in the leasing of common lands in a community land grant. The defendants are members of the Board of Trustees of the Anton Chico Land Grant located in New Mexico. Under New Mexico statutes, they have the authority to issue leases of the common lands. The complaint asserts that one group of persons has received preferential treatment over another group in the granting of leases, although the members of both have an equal or comparable right to be lessees of the common lands.

The basic issue before the trial court and on appeal in this section 1983 action is whether the actions of the Trustees are under color of state law. The trial court found no such color of state law, and the plaintiffs assert that this was an erroneous conclusion.

The Anton Chico Land Grant is a community grant to the inhabitants of Anton Chico. There is nothing unusual in the history of the Grant nor in the laws which were, and are applicable. The grant of land was originally made in 1822 and the settlers were driven off the land by the Indians. The Grant was finally made in the usual form under the Constitution of Mexico. After New Mexico became part of the United States, the inhabitants in 1859 asked Congress for confirmation of the Grant.

After an investigation had been made by the Surveyor General, who concluded that the Grant was valid, Congress confirmed the Grant in 1860, and a patent issued much later. The Surveyor General and Congress were only concerned with the validity of the Grant and the title to the land. Their confirmation was of the title as it then existed, and patent, of course, only related to the title. The confirmation was significant in that the act of confirmation controls over the patent and it was a final pronouncement as to title and the nature of the Grant. *Tameling v. United States Freehold & Emigration Co.,* 93 U.S. 644, 23 L.Ed. 998.

The State of New Mexico passed a number of statutes relating to particular community land grants and a general statute. The Anton Chico Land Grant is within the general statute, N.M.S.A.1953, §§ 8–1–1 et seq., which has undergone some change, but basically remains as it was enacted in 1907.

There has been much litigation over the years pertaining to the land grants in New Mexico. The Anton Chico Land Grant was the subject of the suit which culminated in the opinion of the court for what was this Circuit in *Reilly v. Shipman,* 266 F. 852. Reference is made to that opinion for a description of this Grant. There have been many other opinions by the New Mexico courts and the federal courts relating to community grants similar to the one here concerned.

The confirmation of this Grant by Congress was the final word on validity of the Grant and as to where and how title was or should be vested. The Act itself, of

course, controls. The character or nature of the Grant, and the description of the grantees are but different aspects of the same matter. Confirmation by Congress was thus a title matter only, and if there were interrelated aspects of the original Spanish or Mexican grant, such as a local or community government, these were separated from the title by the confirmation. The Surveyor General determined that a "community" existed only as an element in the validity conclusion. The confirmation was thus of title only, and where it should vest. We do not have a *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 situation, nor *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373.

■ A careful examination of the applicable statutes of New Mexico (N.M.S.A. 1953, §§ 8–1–1 et seq.) also demonstrates that the State sought only to direct the creation of an organization to manage and control the "grant and real estate." The statutes provide for the machinery, for elections of trustees, qualifications of trustees, meetings, and powers of the trustees. Generally, persons residing within the boundaries of the Grant for five years and who have an "interest" in the common lands may vote for the trustees. N.M.S.A.1953, § 8–1–5. The grant of powers to the trustees is as follows, and appears to be the same as in 1907:

"I. To control, care for and manage the said grant and real estate, and to prescribe the terms and conditions under which the common lands thereof may be used and enjoyed, and to make all necessary and proper rules and regulations for the government thereof.

"II. To sue and be sued under the title aforesaid.

"III. To sell, convey, lease, or mortgage so much of the land grant or real estate under its control as aforesaid as is held in common.

"IV. To prescribe the price to be paid for the use of the said common lands and to prohibit any person failing or refusing to pay such amount from using any portion of the same while he continues in

default in such payments; Provided, that the amount so fixed shall be in proportion to the number and kinds of livestock pasturing upon such common lands.

"V. To adopt and use an official seal.

"VI. To appoint judges and clerks of election at all elections herein provided for, subsequent to the first, and to canvass the votes cast thereat."

It is also provided that the trustees may bring actions in ejectment against anyone claiming private ownership or a trespass action against anyone on the common lands. The statutes also provide that sales, mortgages, or leases of the common lands "shall not take effect . . . until after approval by the district judge."

The common lands are not open to the public; they are private property and may be leased. Only the heirs of the original claimants can use them for wood gathering and similar purposes without lease or consent of the trustees.

The state statutes thus create an entity to manage the common lands here concerned. The rights of the residents in these lands have been characterized in several ways by the courts. In *Moya v. Chilili Coop. Assn., Inc.,* 87 N.M. 99, 529 P.2d 1220, the court described the rights as "participating interests" in the common lands. We need not here define the rights other than to recognize that some rights to use of the common lands do exist in the "heirs," as plaintiffs describe themselves.

■ The New Mexico courts have described the trustees and their management in various ways for various purposes. The state courts have used the term "quasi-municipal corporations" in several opinions, but with qualifications. *Board of Trustees of Town of Las Vegas v. Montano,* 82 N.M. 340, 481 P.2d 702; *Bibo v. Town of Cubero Land Grant,* 65 N.M. 103, 332 P.2d 1020; *Kavanaugh v. Delgado,* 35 N.M. 141, 290 P. 798; and others. The term has been used with no absolute or even well defined general meaning because it is used in different ways for different purposes. It expresses a legal conclusion based on a variety of fac-

tors. Whether or not this is a quasi-municipal corporation is of no significance in the resolution of the question here concerned. Such a label cannot be determinative of these issues nor even be helpful as it is too remote from the ultimate determination. The "color of state law" issue is, of course, a federal problem. It is not resolved by whether this is a quasi-municipal corporation or not as appellants urge.

We must conclude that the state statute providing for the management of the lands of this Grant is limited in scope to such management of the lands and nothing more. It is an authorization and direction for the creation of the machinery to perform such a function. The elective process therein involved does not change its character.

There is no continuing supervision or control by the state over the trustees or what they do, nor is there a continuing relationship.

■ The closest the state statute comes to a continuing relationship is by the provisions of N.M.S.A.1953 § 8–1–11, which was added in 1913 and provides:

"No sale, mortgage or other alienation of the common lands within such grant shall take effect unless authorized by a resolution duly adopted by the said board of trustees, and until after approval of such resolution by the district judge of the district within which said grant or a portion thereof is situate."

See Bibo v. Town of Cubero Land Grant, 65 N.M. 103, 332 P.2d 1020. This requirement for approval by the state district judge is a factor, but it does not alter the conclusion that there is no intermixture of private and public matters or functions. No state use of a private entity results as in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830. There have been in the past several precedents wherein the district courts or district judges are designated to act in various ways in what are purely private matters when there is a need to designate a disinterested person to act. The "approval" contemplated in section 8–1–11 does not extend to anything more than the final act of the trustees, and in no way to the manner in which they arrived there. There is no indication in the statute that the district judge is to do anything more than to see that the formalities of issuance are observed. The requirement for approval does not extend to an approval of the matters and considerations leading up to the execution of the lease by the trustees, nor to standards, nor to rental. Of course, the action of the district court is on leases already issued, and not as to the rejection of applications to lease as here complained of. It is a part of the overall machinery, but as above mentioned we do not consider it to be significant.

■ The state statute is the limit of the state involvement in this Grant; its scope determines the "color of state law." This scope is narrow as it only covers the management of the lands within the Grant, creates a corporate type structure, and prescribes voting qualifications. There are no governmental functions contemplated by the statutes. It takes a strained reading indeed to infer anything beyond the management of the lands. There is no ongoing relationship as in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, argued by appellants. The state gives no support or maintenance as considered in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.

This case was remanded, and further facts were developed. These show that the trustees may have expanded their functions in the several towns within the Grant. We express no opinion as to these matters, as our consideration is limited to the provisions of the statute as this is the extent of color of state law. In view of the age of the several sections of the statute, we see no basis for an argument that there has been a legislative ratification of the acts of the trustees.

We must conclude that the trial court reached the correct result. There is shown no state action and no state involvement in a private entity to bring about a contrary result, as urged by appellants.

AFFIRMED.