# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2014-NMSC-006

Filing Date:  February 6, 2014

Docket No. 33,497

RAYELLEN RESOURCES, INC.,
DESTINY CAPITAL, INC., LYNNE E.
ELKINS, PAULA D. ELKINS, JOY BURNS,
CEBOLLETA LAND GRANT, FERNANDEZ COMPANY
LTD., JUDITH WILLIAMS PHIFER, individually and as
Personal Representative of the Estate of JAMES H. WILLIAMS,
ORIN CURTIS CLEVE WILLIAMS, RIO GRANDE RESOURCES
CORPORATION, STRATHMORE RESOURCES (U.S.) LTD., LARAMIDE
RESOURCES (U.S.A.) LTD., ROCA HONDA RESOURCES, LLC,

       Plaintiffs-Appellees,

and

HON. PATRICK H. LYONS, Commissioner of Public Lands for the
State of New Mexico,

       Plaintiff,

v.

NEW MEXICO CULTURAL PROPERTIES REVIEW COMMITTEE
and ALAN "MAC" WATSON, individually and as Chairman of
the New Mexico Cultural Properties Review Committee,

       Defendants-Appellants,

and

PUEBLO OF ACOMA and PUEBLO OF
LAGUNA, federally recognized Indian Tribes,

       Intervenors.

CERTIFICATION FROM THE NEW MEXICO COURT OF APPEALS
William G. W. Shoobridge, District Judge

1

Long, Pound & Komer, P.A.
John Bennett Pound
Santa Fe, NM

for Appellants

The Simons Firm, L.L.P.
Frank M. Bond
Kelcey C. Nichols
Santa Fe, NM

for Appellees Rayellen Resources, Inc. and Destiny Capital, Inc.

Comeau, Maldegen, Templeman & Indall, L.L.P.
Michael J. Moffett
Jon J. Indall
Santa Fe, NM

for Appellees Lynne E. Elkins, Paula D. Elkins, Joy Burns, Strathmore Resources (U.S.)
Ltd., Laramide Resources (U.S.A.) Ltd., and Roca Honda Resources, LLC.

Olsen, Parden & Crow, P.C.
Brett Justin Olsen
Albuquerque, NM

Albuquerque Business Law, P.C.
Sarah L. Maestas Barnes
Albuquerque, NM

for Appellee Cebolleta Land Grant

Cavin & Ingram, P.A.
Stephen Dean Ingram
Albuquerque, NM

for Appellee Fernandez Company Ltd.

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Stuart R. Butzier
Marte D. Lightstone
Albuquerque, NM

for Appellees Judith Williams Phifer and Orin Curtis Cleve Williams

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Larry P. Ausherman
Stanley N. Harris
Albuquerque, NM

for Appellee Rio Grande Resources Corporation

Chestnut Law Offices
Ann Berkley Rodgers
Peter C. Chestnut
Albuquerque, NM

for Intervenor Pueblo of Acoma

June Lynne Lorenzo
Paguate, NM

for Intervenor Pueblo of Laguna

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu L.L.P.
Richard Warren Hughes
Santa Fe, NM

for Amici Curiae All Indian Pueblo Council, American Anthropological Association, Association on American Indian Affairs, National Trust for Historic Preservation, Sierra Club, Society for American Archaeology, Pueblo of Tesuque, and Thomas Merlan

Hinkle, Hensley, Shanor & Martin, L.L.P.
Andrew J. Cloutier
Roswell, NM

Armstrong Energy Corporation
Ronald D. Hillman
Roswell, NM

Pittman Law Firm, P.C.
Jennifer M. Heim
Roswell, NM

for Amici Curiae New Mexico Cattle Growers Association and New Mexico Farm & Livestock Bureau

Brennan & Sullivan, P.A.
Michael W. Brennan

3

Santa Fe, NM

for Amici Curiae New Mexico Mining Association and New Mexico Oil and Gas
Association

Law & Resources Planning Associates, P.C.
Charles Thomas Dumars
Albuquerque, NM

Youtz & Valdez, P.C.
Stephen Curtice
Albuquerque, NM

for Amicus Curiae New Mexico Land Grant Council

Elizabeth S. Merritt
William J. Cook
Washington, DC

for Amicus Curiae National Trust for Historic Preservation

**OPINION**

**DANIELS, Justice.**

## I.    INTRODUCTION

**{1}** We accepted certification from the Court of Appeals to review the decision of the
New Mexico Cultural Properties Review Committee to recognize approximately 400,000
acres of public land on Mount Taylor as a registered cultural property under the New Mexico
Cultural Properties Act. We affirm in part the Committee's decision and hold that the Mount
Taylor listing was lawful under the Cultural Properties Act and that the proceedings before
the Committee did not violate the constitutional guarantee of due process of law. We reverse
the Committee's inclusion of 19,000 acres of Cebolleta Land Grant property and hold that
land grant property is not state land as defined in the Cultural Properties Act.

## II.    BACKGROUND

### A.    Factual History and Administrative Proceedings

**{2}** In February 2008, the United States Forest Service released a report determining that
Mount Taylor was eligible for listing on the National Register of Historic Places as a
traditional cultural property. The detailed report, written by two archaeologists who spent
months working with several of the mountain's surrounding tribal communities, documents

4

the cultural and ethnographic history of Mount Taylor, which, at more than 11,000 feet, is the highest point in the San Mateo Mountains of New Mexico. The report chronicles the history of the mountain and its importance to various cultures, noting prehistoric archaeological sites predating 500 A.D. and rock inscriptions from Spanish settlers who may have passed through the area as early as 1540 with the historic Francisco Vasquez de Coronado expedition.

{3}     The report concludes that Mount Taylor satisfies three out of four possible criteria for National Register listing based on the mountain's "significant contributions to the broad patterns of our history," its association with "persons significant in our past," and its past and potential future yield of information about our history. *See* 36 C.F.R. § 60.4 (2008) (providing the four "National Register criteria," each of which qualifies a site for National Register listing). The report also concludes that Mount Taylor meets the overall "integrity" criterion for National Register listing because the property was, and still is, integral to the tribal communities' practices, from traditional gathering of plants and minerals to performing pilgrimages and ceremonies, noting that the mountain's physical features that historically have attracted various cultures still exist today. *See* 36 C.F.R. § 60.4 (requiring "integrity of location, design, setting, materials, workmanship, feeling, and association" as the "quality of significance" for each candidate property); *accord Nat'l Register Bulletin* 38 at 11-12 (rev. 1998), http://www.nps.gov/nr/publications/bulletins/pdfs/nrb38.pdf.

{4}     Ten days after the report's release, the Pueblos of Acoma, Laguna, and Zuni, the Hopi Tribe, and the Navajo Nation (collectively, the Nominating Tribes) submitted an emergency application to the New Mexico Cultural Properties Review Committee, requesting that Mount Taylor be temporarily registered as a cultural property under Section 12 of the New Mexico Cultural Properties Act, NMSA 1978, §§ 18-6-1 to -17 (1969, as amended through 2013), our state's counterpart of the National Historic Preservation Act.

{5}     Under the Cultural Properties Act, the Committee is allowed to approve an emergency listing "for not more than one year, during which time the [C]ommittee shall investigate the property and make a determination as to whether it may be permanently placed on the official register" of New Mexico cultural properties. Section 18-6-12. Once a property is listed, other state departments must consult the New Mexico historic preservation officer before taking any action "which may affect a registered cultural property . . . so as to preserve and protect, and to avoid or minimize adverse effects on, registered cultural properties." Section 18-6-8.1. A consultation requirement also comes into effect when a property is deemed eligible for National Register listing, as in the Mount Taylor case in 2008 upon the release of the Forest Service report. *See, e.g.*, 19.10.6.602(D)(13)(i) NMAC (requiring permits for new mining operations to indicate all sites included in the permit area that are "on or eligible for listing on either the National Register of Historic Places and/or the State Register of Cultural Properties"); *but see* 19.10.3.302(D)(2) NMAC (requiring permits for "minimal impact" mining operations to indicate locations of only those cultural resources actually listed on either the national or state registers).

5

**{6}**     On February 22, 2008, eight days after the Nominating Tribes submitted the emergency application, the Committee approved a one-year temporary listing. Although the Nominating Tribes included the Forest Service report as supporting documentation for the emergency application, the state nomination was slightly different from the Forest Service Report. The Forest Service relied on topography, delineating boundaries of the traditional cultural property based on the mountain's summit and its surrounding mesas, but the Nominating Tribes focused on elevation, drawing a demarcation line around the summit at 8,000 feet because, according to the Nominating Tribes, private landowners became more numerous below this elevation. The Nominating Tribes asked the Committee to recognize 422,840 acres consisting of federal land managed by the Forest Service and the Bureau of Land Management, Indian trust and Pueblo land, New Mexico state lands, and the Cebolleta Land Grant common lands. The Nominating Tribes asked that any private land above 8,000 feet be identified and excluded from the listing. On June 14, 2008, following a public comment period, the Committee again approved the emergency listing of the specified property at the top of Mount Taylor.

**{7}**     On April 22, 2009, fourteen months after submitting their emergency petition, the Nominating Tribes nominated the same land on Mount Taylor for permanent listing under the Cultural Properties Act. In response, the Committee scheduled a public comment period that included a public hearing on May 15, 2009, the submission of written comments through May 20, 2009, and a final vote on June 5, 2009. As with the emergency petition, private land was explicitly excluded from the proposed listing as noncontributing, but the Nominating Tribes changed the listing's outer boundaries to be consistent with the topographic boundary used by the Forest Service after agreeing that it better reflected the individual tribes' shared use of the mountain.

**{8}**     At the close of the May 15, 2009, hearing, the Committee asked the Nominating Tribes to revise the nomination and resubmit it by May 23, 2009, in order to include a gross acreage figure for both contributing and noncontributing properties, among other clarifications. The Committee asked private land owners to verify private property exclusions by submitting notarized copies of their property deeds to the Historic Preservation Department. On June 4, 2009, the Committee released an updated estimate on the proposed permanent listing, explaining that 434,767 acres of public land would be included and 89,939 acres of private land would be excluded as noncontributing. On June 5, 2009, the Committee voted unanimously to permanently list Mount Taylor as a cultural property on the state historic register, issuing a final order on September 14, 2009.

## B.     Judicial Proceedings

**{9}**     One month after the Committee issued its final order, Rayellen Resources, Inc., and numerous other parties including the Cebolleta Land Grant (the Rayellen parties) appealed the order to the Fifth Judicial District Court under Rule 1-075 NMRA, which provides for district court review of a final agency decision. The Pueblo of Acoma, which joined the Committee in defending the listing, challenged whether the Rayellen parties who are private

landowners had standing to appeal because they were explicitly excluded from the listing, an argument the district court rejected.

**{10}** In reaching the merits of the case in its February 2011 decision and order, the district court found that the listing did not violate constitutional protections against the establishment of religion and that the Committee did not violate due process guarantees by following federal guidelines for the listing. The district court reversed the listing nevertheless on the grounds that personal notice of the permanent listing's public comment period was not provided to all affected property owners, including mineral rights holders, in violation of due process guarantees, and that both the mountain's sheer size and the private property exclusions made it impracticable to comply with provisions in the Cultural Properties Act relating to integrity of place, required inspections, and required maintenance. The district court also reversed the inclusion of the 19,000 acres of Cebolleta Land Grant common lands in the listing because land grant common lands are not subject to regulation as state land under the Cultural Properties Act.

**{11}** Acoma Pueblo petitioned for certiorari in the Court of Appeals on the three listing issues which the district court reversed, and the Rayellen parties cross-petitioned on other issues as to which they had not prevailed in the district court. The Court of Appeals granted those petitions as well as motions to intervene from Laguna Pueblo and the Committee. Without deciding any of the issues, the Court of Appeals then certified the entire case to this Court as presenting "an issue of substantial public interest that should be determined by the supreme court." NMSA 1978, § 34-5-14(C)(2) (1972).

## III.    DISCUSSION

**{12}** Preliminarily, we note that the parties have not challenged the constitutional powers of the Legislature either to enact any of the provisions of the Cultural Properties Act or to delegate to the Committee the administrative responsibility of determining which properties should be designated as deserving of the protections embodied in the Act. The challenges in this case relate more specifically to whether the Committee exercised its authority in a lawful manner.

### A.    Standing

**{13}** The parties who sued to block the listing of Mount Taylor as a cultural property represent a variety of arguably different interests, including interests in surface properties excluded from the listing, mineral interests only, and interests in Cebolleta surface property specifically included in the designation. Various challenges have been directed at the standing of most of the parties. *See ACLU of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 19, 144 N.M. 471, 188 P.3d 1222 (holding that to establish standing a party bringing suit must "show that he is injured or threatened with injury in a direct and concrete way").

**{14}** Because the parties generally concede that Cebolleta does have standing to raise the

same substantive issues raised by other interests, and because, like the Court of Appeals in certifying this appeal to us, we view this unusual application of the New Mexico Cultural Properties Act as a matter of substantial public importance, we will not engage in the non-outcome-determinative exercise of identifying which of the numerous individual challengers did and did not have standing to raise issues that we should address in any event. Regardless of whether traditional standing requirements have been met, in appropriate cases "this Court has exercised its discretion to confer standing and reach the merits . . . due to the public importance of the issues involved." *Id.* ¶ 9. We determine that this is such a case.

## B. Standard of Review

**{15}** The standards for our appellate review of the Committee's administrative decision are well settled in New Mexico law. "[W]e apply the same administrative standard of review as the district court sitting in its appellate capacity." *Sais v. N.M. Dep't of Corrs.*, 2012-NMSC-009, ¶ 15, 275 P.3d 104 (alteration in original) (internal quotation marks and citation omitted). In doing so, we must determine if the Committee's decision was "arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law." *Id.* (internal quotation marks and citation omitted); *accord* Rule 1-075(R) NMRA.

**{16}** "A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806. "In making these determinations, we must remain mindful that in resolving ambiguities in the statute or regulations which an agency is charged with administering, the Court generally will defer to the agency's interpretation if it implicates agency expertise." *Id.* (internal quotation marks and citation omitted). "It is not the function of the trial court to retry the case . . . or substitute its judgment for that of [an administrative agency]." *Id.* (alteration in original) (internal quotation marks and citation omitted). "However, we will not defer to the [agency's] or the district court's statutory interpretation, as this is a matter of law that we review de novo." *Id.* (alteration in original) (internal quotation marks and citation omitted).

## C. The Committee Provided Sufficient Notice of the Public Comment Period for Its Review of the Permanent Mount Taylor Nomination

**{17}** The Rayellen parties argue that the Mount Taylor permanent listing violates due process because the Committee failed to provide personal notice to all affected property owners, including all mineral rights holders, before depriving them of a property right, relying on *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and *Uhden v. New Mexico Oil Conservation Commission*, 1991-NMSC-089, ¶¶ 9-10, 112 N.M. 528, 817 P.2d 721. Specifically, the Rayellen parties argue that some in the Williams group who hold subsurface mineral rights to property in or near the listing did not receive personal notice of the Committee's hearings and that notice by publication was insufficient—a conclusion reached by the district court. For the reasons that follow, we disagree.

**{18}** Article II, Section 18 of the New Mexico Constitution provides, "No person shall be deprived of life, liberty or property without due process of law . . . ."). *See also* U.S. Const. amend. XIV (stating that no state shall "deprive any person of life, liberty, or property, without due process of law"). We review de novo whether due process has been denied, a question of law, and apply substantial-evidence review to the findings of fact. *Bd. of Educ. of Carlsbad Mun. Schs. v. Harrell*, 1994-NMSC-096, ¶ 52, 118 N.M. 470, 882 P.2d 511. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jones v. N.M. State Racing Comm'n*, 1983-NMSC-089, ¶ 20, 100 N.M. 434, 671 P.2d 1145.

**{19}** Procedural due process requires notice and the opportunity to be heard before a deprivation by the state can occur. *See Maso v. State Taxation & Revenue Dep't, Motor Vehicle Div.*, 2004-NMSC-028, ¶ 10, 136 N.M. 161, 96 P.3d 286 ("Due process requires notice and an opportunity for a hearing before the State can suspend or revoke a person's driver's license."). "Due process does not require the same form of notice in all contexts; instead, the notice should be 'appropriate to the nature of the case.'" *Id.* (quoting *Mullane*, 339 U.S. at 313); *see also Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

**{20}** Nothing in *Mullane* or its progeny establishes that personal notice is required in all cases. Rather, this Court has made clear that the opposite is true: "[I]t is well settled that the fundamental requirements of due process in an administrative context are reasonable notice and opportunity to be heard and present any claim or defense." *TW Telecom of N.M., L.L.C. v. N.M. Pub. Regulation Comm'n*, 2011-NMSC-029, ¶ 17, 150 N.M. 12, 256 P.3d 24 (emphasis omitted) (internal quotation marks and citation omitted). Our inquiry here must be whether the notice provided by the Committee was reasonably calculated under the circumstances to inform interested parties of its action in order to afford them the opportunity to be heard.

**{21}** None of the parties dispute that the Committee made extensive efforts to provide notice about the public comment period before voting on Mount Taylor's permanent listing. This effort included general notice by publication in both *The Gallup Independent* and *The Cibola County Beacon* by sending press releases to various print and broadcast media and by making the proposed nomination available on the New Mexico Historic Preservation Division website, www.nmhistoricpreservation.org. The Committee also provided extensive personal notice, sending hundreds of letters along with the meeting agenda to those in its database of property owners, citizens, business owners, and elected officials who had expressed an interest in Mount Taylor's nomination since the emergency listing hearings in 2008.

**{22}** Part of this database was the result of the Nominating Tribes' hiring of research consultants to locate private property owners via tax records in order to provide them with

9

personal notice. Because the Cultural Properties Act does not provide notice requirements, the Nominating Tribes relied on the language of the National Historic Preservation Act to discern what notice may be required for the Mount Taylor nomination. *See* § 18-6-2 (stating that the Cultural Properties Act operates "in a manner conforming with, but not limited by, the provisions of the National Historic Preservation Act"). Under the 1966 National Historic Preservation Act, a state is directed by regulations amended in 1983 to create a list of property owners "obtained from either official land recordation records or tax records, whichever is more appropriate," for notice purposes when private property is being considered for listing. *See* 36 C.F.R. § 60.6(c) (2012); *but see* 36 C.F.R. § 60.6(d) (requiring written notice to local elected officials and only general notice by publication to property owners when a proposed listing involves more than fifty properties). Even though the Mount Taylor nomination explicitly excludes private land, the Nominating Tribes searched tax records in three counties and ultimately identified more than one hundred landowners within the listing in order to provide them with personal notice.

**{23}** We conclude that these efforts by the Committee complied with *Mullane* in providing notice reasonably calculated to inform interested parties of the Mount Taylor permanent nomination. *See Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 1988-NMSC-036, ¶¶ 14, 21, 107 N.M. 278, 756 P.2d 558 (rejecting a due process challenge to an agency action because the notice reasonably informed objectors of the hearing so as to allow them the opportunity to be heard).

**{24}** Despite these efforts, the Rayellen parties argue that notice was inadequate because the Nominating Tribes relied on county tax records when they should have relied on county land records, because "tax records are useful only for determining who pays property taxes."[1] Under the Rayellen parties' argument, if the Committee had performed proper due diligence, it would have discovered the Williams mineral ownership and then provided personal notice to those Williams parties, as the Rayellen parties argue would be required by *Uhden*, 1991-NMSC-089, ¶ 12 ("[W]hen the names and addresses of affected parties are known, or are easily ascertainable by the exercise of diligence, notice by publication does not satisfy constitutional due process requirements.").

**{25}** In *Uhden*, this Court held that due process was violated when the New Mexico Oil Conservation Commission failed to provide personal notice to a mineral rights owner before hearing an application by Amoco Production Company to increase the spacing for one of its oil and gas wells. *See id.* ¶¶ 4, 6, 13. Although the statute governing the proceeding allowed either personal notice or notice by publication, *see id.* ¶ 4, *Uhden* held that notice by publication was inadequate because the Commission's hearing of Amoco's well application

---

[1]We note that neither county tax records, which identify payers of county property taxes who may or may not be the property owners, nor county land records, which identify only those owners of county property to whom conveyance of their titles is recorded with the county clerk, necessarily include a complete record of property ownership in a county.

was not a rule-making proceeding but, in effect, an adjudication of the mineral rights owner's property right, *see id.* ¶ 7, based on three considerations. First, Amoco needed to support the change in the well spacing by substantial evidence, which it did by presenting witnesses and evidence about the specific well area. *See id.* Second, the Commission's ruling to change the well spacing reduced the owner's mineral rights royalties by half. *Id.* ¶¶ 5, 8. And third, Amoco was aware of the mineral rights owner's identity and whereabouts because for several years the company had been sending the owner royalty payments based on the well's production. *See id.* ¶¶ 3-4, 13. The *Uhden* Court concluded in a narrow holding:

> On these facts, . . . if a party's identity and whereabouts are known or could be ascertained through due diligence, the due process clause of the New Mexico and United States Constitutions requires the party who filed a spacing application to provide notice of the pending proceeding by personal service to such parties whose property rights may be affected as a result.

*Id.* ¶ 13.

**{26}**     The facts of the Mount Taylor listing are wholly different from those in *Uhden*. While we agree with the Rayellen parties that they, like the mineral rights owner in *Uhden*, undoubtedly possess private property rights in both their land and mineral interests, *see, e.g.*, *id.* ¶ 8 ("Mineral royalty retained or reserved in a conveyance of land is itself real property." (internal quotation marks and citation omitted)), the nature of these rights is not at issue.

**{27}**     Unlike in *Uhden*, the Committee's review of the Mount Taylor listing was not an adjudication of the Rayellen parties' private property rights. The Committee instead was reviewing the nomination to determine whether Mount Taylor should be recognized as a state cultural property in order to better protect its historical significance. The Committee's action is a regulatory one more akin to general rule-making than adjudication, one undertaken to effectuate the Committee's statutory powers to identify and preserve our state's cultural and historic heritage. *See Timberon Water Co., Inc. v. N.M. Pub. Serv. Comm'n*, 1992-NMSC-047, ¶ 23, 114 N.M. 154, 836 P.2d 73 (distinguishing an administrative action as regulatory when it furthers the public interest under the state's police powers and adjudicatory when it is based on adjudicating a private right rather than implementing public policy); *see also* NMSA 1978, § 10-15-1(H)(3) (1999, amended 2013) (defining an "administrative adjudicatory proceeding" under the Open Meetings Act as "a proceeding brought by or against a person before a public body in which individual legal rights, duties or privileges are required by law to be determined by the public body after an opportunity for a trial-type hearing"). Because no individual property rights were being adjudicated by the Mount Taylor listing, personal notice was not required. If this Court were to require personal notice to every affected party before an agency undertakes rule-making such as this, the notice requirement would be so unduly burdensome and impractical as to be insurmountable, in contrast to the reasonableness standard set forth in *Mullane*. *See also Maso*, 2004-NMSC-028, ¶ 10 (explaining that notice is to be "reasonably calculated to be effective without imposing unrealistically heavy burdens on the party charged with the duty

of notification" (internal quotation marks and citation omitted)).

{28}    Procedural due process is ultimately about fairness, ensuring that the public is notified about a proposed government action and afforded the opportunity to make its voice heard before that action takes effect. *See Uhden*, 1991-NMSC-089, ¶ 10 (explaining that administrative proceedings must conform to the due process requirements of fairness and reasonableness). In this case, the Committee made extensive efforts to apprise the public about the Mount Taylor nomination by general publication and by going so far as to extend personal notice to hundreds of interested parties, including those private property owners it was able to identify within and around the proposed listing area. As the Rayellen parties acknowledge, the Committee succeeded in its goal to apprise the public based on the fact that every party to this appeal save one received actual notice.

{29}    Accordingly, we reverse the district court and hold that the Committee provided sufficient notice of the public comment period to satisfy due process guarantees.

**D.    The Listing Satisfies Statutory Requirements on Maintenance, Inspection, and Integrity**

{30}    The district court agreed with the Rayellen parties' arguments that under the statutory language of the Cultural Properties Act, Mount Taylor is simply too large to be reasonably inspected and maintained and that "such a massive . . . area, whose acreage has yet to be correctly and finally defined . . . can not 'possess integrity of location[]' as set out as . . . criteria under federal guidelines followed by the [Committee]."

{31}    The Cultural Properties Act directs the Committee "to take such actions as are reasonable and consistent with law to identify cultural properties and to advise on the protection and preservation of those properties." Section 18-6-5. One of the enumerated duties of the Committee in achieving this directive is to "inspect all registered cultural properties periodically to assure proper cultural or historical integrity and proper maintenance," § 18-6-5(D), and, "based upon the inspection of a registered cultural property, recommend such repairs, maintenance and other measures as should be taken to maintain registered status," § 18-6-5(E). Nothing in this statutory language sets a limit as to how large a listed property can be. Although this appears to be the first New Mexico listing of a large geographical area, other sizeable historic sites have been nominated, listed, or declared eligible for National Register listing, such as the San Francisco Peaks in Arizona, *see Nat'l Register Bulletin* 38 at 6; Tahquitz Canyon in California, *see id.* at 13, 17; and Kaho'olawe Island in Hawaii, *see id.* at 14, 17.[2] We see no reason, either in the text of the Act or in logic,

---

[2]*See, e.g.*, *An Introduction to the Land-Use History of the Colorado Plateau: San Francisco Peaks, Arizona* 2 (John D. Grahame & Thomas D. Sisk eds., 2002), http://www.cpluhna.nau.edu/Places/san_francisco_peaks2.htm (reciting that the Forest Service has requested designation of the San Francisco Peaks in Arizona as a Traditional

why our state authorities are prohibited from listing a property simply because it is large.

**{32}** Nor does our review of the record indicate that the Mount Taylor listing, albeit large, is somehow incapable of inspection and maintenance. To the contrary, the Committee argues that eighty percent of the Mount Taylor listing is owned by federal agencies and the State Land Office, both of which have inspection programs that can fulfill the Act's inspection mandate. Although the Rayellen parties counter that the Committee never made any findings on the feasibility of inspecting or maintaining prior to the Mount Taylor listing, the Act does not make such findings a prelisting requirement. How the Committee intends to inspect and maintain Mount Taylor is a statutory consideration that follows rather than precedes the listing. *See* § 18-6-5(E) ("[B]ased upon the inspection of a registered cultural property, [the Committee shall] recommend such repairs, maintenance and other measures as should be taken to *maintain* registered status." (emphasis added)).

**{33}** With regard to the Rayellen parties' argument that the listing lacks "integrity of location" because of the checkerboard nature of noncontributing private land, 4.10.4.7(C) NMAC defines "integrity" as "the quality or characteristics which make the property eligible for listing in the [N]ew [M]exico register of cultural properties." *Accord* § 18-6-5(F) (requiring the Committee to issue regulations "pertaining to the identification, preservation and maintenance of registered cultural properties in order to maintain the integrity of those properties").

**{34}** In connection with the federal listing, the Forest Service explained in its 2008 report that Mount Taylor met the federal integrity requirement in three respects—location, setting, and association—based primarily on the site's ongoing relationship with traditional cultural practices and because the physical attributes of the mountain remain largely unchanged. The Nominating Tribes' May 22, 2009, application for permanent listing of Mount Taylor in the New Mexico State Register of Cultural Properties supported the federal determination of an ongoing relationship, explaining that land-altering activities on the mountain and the exclusion of private property may "cause the Nominating Tribes to adjust some practices, such as the route that community members might follow while on pilgrimage . . . , [but] the scope of change . . . is rather minor. . . . These . . . modifications do not compromise cultural norms or needs." Property Number 1939 Application for Registration, New Mexico State Register of Cultural Properties, Section 12 at 110. We conclude that substantial evidence supports the Committee's finding on integrity.

---

Cultural Property and has recommended a 74,000-acre mineral withdrawal around the Peaks); *Agua Caliente Band of Cahuilla Indians*, http://www.planetpalmsprings.com/sovereign-nation/agua-caliente-cahuilla-indians.html (describing the listed the Tahquitz Canyon area); *Newsletter of the Kaho'olawe Island Reserve Commission* (2004) 2, http://kahoolawe.hawaii.gov/newsletters/newsletter_sum04.pdf (confirming 29,000 acres for Kaho'olawe Island).

**{35}** Accordingly, we reverse the district court and hold that the Mount Taylor listing conforms to statutory requirements on inspection, maintenance, and integrity.

**E.     Cebolleta Land Grant Common Lands Are Not State Land for Purposes of the Cultural Properties Act**

**{36}** Cebolleta Land Grant urges this Court to affirm the district court's conclusion that its common lands are not state land for purposes of the Mount Taylor listing. Acoma Pueblo urges reversal, arguing that the common lands should be considered state land because the Land Grants Act was specifically amended in 2004 to recognize community land grants as political subdivisions of the state, which, under the separately enacted Cultural Properties Act, is one of the statutorily recognized categories of state land. The Committee takes no position on the issue, explaining that statutory interpretation is best addressed by this Court and that excluding the lands will not undermine the listing. For the reasons that follow, we agree with Cebolleta Land Grant that its common lands are not state land for purposes of the Mount Taylor listing.

**{37}** At issue is similar language in the two statutes. The Land Grants Act provides,

> All land grants-mercedes in the state or land grants-mercedes described in Section 49-1-2 NMSA 1978 shall be managed, controlled and governed by their bylaws, by the Treaty of Guadalupe Hidalgo and as provided in Sections 49-1-1 through 49-1-18 NMSA 1978 as *political subdivisions of the state*.

NMSA 1978, § 49-1-1 (2004) (emphasis added). Similarly, the Cultural Properties Act defines "state land" as "property owned, controlled or operated by a department, agency, institution or *political subdivision of the state*." Section 18-6-3(E) (emphasis added). Statutory construction is a question of law that this Court reviews de novo. *See Bishop v. Evangelical Good Samaritan Soc.*, 2009-NMSC-036, ¶ 8, 146 N.M. 473, 212 P.3d 361.

**{38}** "The first step in any statutory construction is to try to determine and give effect to the Legislature's intent." *State v. Nick R.*, 2009-NMSC-050, ¶ 16, 147 N.M. 182, 218 P.3d 868 (internal quotation marks and citation omitted). Despite Acoma Pueblo's argument that statutory use of the term "political subdivision" in both the Land Grants Act and the Cultural Properties Act requires a conclusion that the Legislature intended that common lands be considered state land for purposes of a cultural or historic properties listing, the history of community land grants and the purpose of the Land Grants Act leads us to the opposite conclusion. *See State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 (directing a court to examine the history and background of a statute when "a formalistic and mechanical statutory construction" leads to results that are absurd, unreasonable, or contrary to statute's spirit).

**{39}** Our courts have long recognized that the common lands of a community land grant are jointly held as private property by the heirs of the land grant. *See Mondragon v. Tenorio*,

554 F.2d 423, 424-25 (10th Cir. 1977) (addressing a federal civil rights claim under the New Mexico Land Grants Act and explaining that "[t]he common lands are not open to the public; they are private property and may be leased. Only the heirs of the original claimants can use them for wood gathering and similar purposes without lease or consent of the trustees."), *recognized by Maestas v. Board of Trustees of Anton Chico Land Grant*, 1985-NMSC-068, ¶¶ 8-9, 103 N.M. 77, 703 P.2d 174); *see also* U.S. General Accounting Office, *Treaty of Guadalupe Hidalgo: Findings & Possible Options Regarding Longstanding Community Land Grant Claims in N.M.*, GAO-04-059, 17 (2004), http://www.gao.gov/assets/160/157550.pdf (explaining that community land grants differ from individual land grants because of the inclusion of common lands, which were held in perpetuity for the heirs of the community land grant and "could not be sold or otherwise alienated, while an individual grant could be transferred"). Based on the unique nature of the private property rights to these common lands, the New Mexico Territorial Legislature passed the Land Grants Act in 1907, specifying that community land grants create a board of trustees to manage their common lands. *See* NMSA 1915, § 801(I) (1907) (establishing a board of trustees for "[t]he management and control of all . . . land" in the land grant, with the power to "prescribe the terms and conditions under which the common lands . . . may be used and enjoyed"); *see* NMSA 1978, § 49-1-3(A) (2011) (same); *accord Armijo v. Cebolleta Land Grant*, 1987-NMSC-006, ¶ 6, 105 N.M. 324, 732 P.2d 426 ("[A]s a practical matter the Legislature has assumed the function of exercising control over [community land grants] through statutes providing for their administration by boards of trustees." (second alteration in original) (internal quotation marks and citation omitted)); *Bd. of Trs. of Town of Las Vegas v. Montano*, 1971-NMSC-025, ¶ 16, 82 N.M. 340, 481 P.2d 702 (The "principal function [of the board of trustees] is to hold title to and manage the common lands of the grant.").

**{40}**     Instead of addressing the history and purpose of the Land Grants Act, Acoma Pueblo argues that the political subdivision language was added to the Land Grants Act in 2004 in order for land grants to become eligible for state funding without violating the New Mexico Constitution's antidonation clause. *See* N.M. Const. art. IX, § 14 ("Neither the state nor any county, school district or municipality . . . shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any person, association or public or private corporation . . . ."). Acoma supports its argument by relying on an advisory letter from the Attorney General's office that interprets the 2004 amendment. *See* N.M. Atty. Gen. Advisory Letter to Hon. Bernadette M. Sanchez, N.M. State Senate, at 1 (Sep. 26, 2008) (explaining that the 2004 amendment to the Land Grants Act adding the language on political subdivisions of the state "allowed land grants to organize and become eligible for state and federal funding."). Under Acoma's theory, if community land grants have been given political subdivision status for the benefit of receiving state money, then they should also bear the burdens of that status for purposes of historical protection under the Cultural Properties Act.

**{41}**     Even if we were to assume that circumventing the antidonation clause was the purpose of the 2004 amendment, recognizing land grants as political subdivisions for purposes of receiving state money does not transform these privately held common lands

15

into state land solely because of the language shared between the Land Grants Act and the Cultural Properties Act. This Court has recognized that "property and property rights are held subject to the fair exercise of the police power and a reasonable regulation enacted for the benefit of public health, convenience, safety or general welfare is not unconstitutional 'taking of property' in violation of [constitutional protections]." *N.M. Bd. of Exam'rs in Optometry v. Roberts*, 1962-NMSC-053, ¶ 20, 70 N.M. 90, 370 P.2d 811. However, the Legislature gave no indication of any intention to attempt to transform privately held common lands into public land by adding the political subdivision language to the Land Grants Act, even assuming it had any power to do so. A legislative taking would violate the privately held rights to these land grant properties that have existed since the land grant's inception and have expressly been confirmed by our federal government under the Treaty of Guadalupe Hidalgo. *See* Treaty of Peace, Friendship, Limits, & Settlement, U.S.-Mex., art. VIII, Feb. 2, 1848, 9 Stat. 922, T.S. 207 ("In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it, guaranties equally ample as if the same belonged to citizens of the United States."). The Treaty's property rights have been recognized in our Constitution, *see* N.M. Const. art. II, § 5 ("The rights, privileges and immunities, civil, political and religious guaranteed to the people of New Mexico by the Treaty of Guadalupe Hidalgo shall be preserved inviolate."), and in our statutes, *see* § 49-1-1 (recognizing that the management, control, and governance of community land grants includes those rights recognized by the Treaty of Guadalupe Hidalgo). We construe the two statutes in favor of an interpretation that complies with the international treaty, the New Mexico Constitution, and our long-standing jurisprudence recognizing the private property rights inherent in a community land grant's common lands. *See Johnson v. N.M. Oil Conservation Comm'n*, 1999-NMSC-021, ¶ 17, 127 N.M. 120, 978 P.2d 327 ("[I]f a statute is susceptible to two constructions, one supporting it and the other rendering it void, a court should adopt the construction which will uphold its constitutionality." (internal quotation marks and citation omitted)).

**{42}** Our conclusion is further supported by the Legislature's action in 2011 amending the Land Grants Act after the Mount Taylor listing specifically to clarify that the 2004 amendment was not intended to change the ownership of these common lands:

> The designation of land grants-mercedes as political subdivisions of the state shall not alter the property rights of the heirs in the common lands. The common lands owned or controlled by a land grant-merced shall not be considered to be, designated or treated as state land.

NMSA 1978, § 49-1-11.1(C) (2011).

**{43}** Accordingly, we affirm the district court's holding that the Cebolleta Land Grant common lands are not state land for purposes of the Cultural Properties Act.

16

**F.     The Remaining Issues Raised by the Rayellen Parties in Their Cross-Appeal Are Without Merit**

**{44}**     In their cross-appeal, the Rayellen parties challenge the Mount Taylor listing on grounds which the district court found nonmeritorious or on which the district court did not rule.

**{45}**     First, the Rayellen parties argue that the Committee did not follow any fixed procedures or regulations in recognizing Mount Taylor for the state cultural property registry and therefore acted arbitrarily, relying on *Smith v. Board of Commissioners of Bernalillo County*, 2005-NMSC-012, ¶ 33, 137 N.M. 280, 110 P.3d 496 (disallowing "[a]d hoc, standard-less regulation"). Although the Rayellen parties correctly assert that the Committee has not promulgated regulations on the conduct of listings, Section 18-6-2 of the Cultural Properties Act provides that the Committee may list properties "in a manner conforming with, but not limited by, the provisions of the National Historic Preservation Act of 1966 (P.L. 89-665)." The district court rejected Rayellen's argument, concluding that the Committee's decision to follow the federal procedure for historic listings was both statutorily permissible and a sufficiently clear guideline to assure the Committee's listing process was not arbitrary and capricious. We agree with the district court, noting that the Committee made it known throughout the Mount Taylor nomination process that it was following the federal procedure as permitted by statute.

**{46}**     Second, the Rayellen parties argue that even if the Committee could follow federal guidelines, it did not comply with those guidelines because the Mount Taylor listing was for religious purposes, and, under 36 C.F.R. Section 60.4, a property used for religious purposes can only be listed when it meets the additional burden of "deriving primary significance from . . . historical importance," a finding the Committee never made. The Rayellen parties overlook a crucial point. In this case, the Committee made numerous findings relating to Mount Taylor's eligibility for listing, including that the nomination satisfied three of the four possible federal criteria because Mount Taylor was associated with significant contributions to our history and with persons significant in our past, and it offers a past and potential future yield of information about our history. Although these findings undoubtedly include a religious component, because religion is part of culture and history, the findings are nonetheless based primarily on historical evidence. For example, the vast number of archaeological sites found on Mount Taylor demonstrates the mountain's significance to various cultures from prehistory, sites that can shed light on the collective history of all New Mexicans. Consistent with the district court's finding that the Committee applied the federal criteria in evaluating Mount Taylor's cultural and historical significance, we hold that substantial evidence supports the Committee's findings on Mount Taylor's historic eligibility, making it unnecessary for the Committee to evaluate the listing under the additional requirements of 36 C.F.R. Section 60.4.

**{47}**     Third, the Rayellen parties argue that the Mount Taylor listing is defective because the property listed on the emergency petition is different from the property in the permanent

petition, in violation of the plain language of Section 18-6-12.

**{48}** Section 18-6-12 states that

> [a] cultural property which the [C]ommittee thinks may be worthy of preservation may be included on the official register on a temporary basis for not more than one year, during which time the [C]ommittee shall investigate the property and make a determination as to whether it may be permanently placed on the official register.

**{49}** While Section 18-6-12 refers to "a cultural property" in the singular, nothing in the plain language of the statute requires that the property remain unchanged from the emergency to the permanent designation. Rather, the year between listings affords the Committee time to "investigate the property," during which time the boundaries of a proposed site could justifiably change, as occurred here. In this case, the Nominating Tribes explained the shift in the site's outer boundaries from one based on elevation to one based on topography, and the Committee explained that the nomination was being revised as privately held lands were identified and excluded from the listing. For this Court to adopt the narrow interpretation advanced by the Rayellen parties would deny the Committee any discretion to investigate and fine-tune boundaries between an emergency and a permanent listing, rendering the investigation language a nullity and contradicting the overall intent of Section 18-6-12.

**{50}** Fourth, the Rayellen parties argue that the permanent listing violates due process because of several issues relating to the public comment period: (1) the Rayellen parties were not provided sufficient time to review the revised permanent nomination, which was available to the public only twenty-three days before the May 15, 2009, hearing, (2) the Nominating Tribes' permanent application was constantly changing as noncontributing properties were identified and excluded, (3) the Committee imposed unfair restrictions on public comment at the May 15, 2009, hearing by limiting speakers to two minutes each while the Nominating Tribes were allowed seventy-five minutes to speak, and (4) the public was not allowed to comment on any revisions submitted after the May 20, 2009, deadline for written public comments before the June 5, 2009, vote. Similar to the Rayellen parties' due process challenge on personal notice, each of these challenges is premised on the Committee's action being an adjudication under *Uhden*, 1991-NMSC-089, ¶¶ 7, 10, for which increased due process protections apply.

**{51}** As we have already stated, "[d]ue process does not require the same form of notice in all contexts; instead, the notice should be 'appropriate to the nature of the case.'" *Maso*, 2004-NMSC-028, ¶ 10 (citation omitted); *see also Pamela A.G. v. Pamela R.D.G.*, 2006-NMSC-019, ¶ 12, 139 N.M. 459, 134 P.3d 746 ("The amount of process due depends on the particular circumstances of each case because procedural due process is a flexible right."). Because the Committee's review of Mount Taylor for listing was rule-making and not adjudication, the due process standards discussed in *Uhden* did not apply. Rather, at issue

18

here is whether the Committee provided a reasonable opportunity to be heard. *See TW Telecom of N.M.*, 2011-NMSC-029, ¶ 17 ("[T]he fundamental requirements of due process in an administrative context are reasonable notice and opportunity to be heard and present any claim or defense." (emphasis omitted) (internal quotation marks and citation omitted)).

**{52}**     Although "[n]otice should be more than a mere gesture[,] it should be reasonably calculated, depending upon the practicalities and peculiarities of the case, to apprise interested parties of the pending action and afford them an opportunity to present their case." *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 21, 148 N.M. 21, 229 P.3d 494 (rejecting the claim that the New Mexico Public Regulation Commission violated due process by changing the focus of an emergency rate increase hearing after notice was provided). "General notice of the issues to be presented at a hearing is sufficient to comport with due process requirements." *Id.*

**{53}**     In this case, the Committee mailed notices and advertised the May 15, 2009, hearing more than a month prior to the hearing, providing sufficient public notice that Mount Taylor's permanent listing was under consideration. Technical detail such as the precise total acreage of excluded property was unnecessary for the Committee or the public in discussing whether Mount Taylor should be recognized as a cultural property.

**{54}**     Similarly, the Committee gave the public sufficient opportunity to provide input by holding the May 15, 2009, hearing at which each member of the public was permitted to speak personally for two minutes and by giving everyone a further opportunity to submit even more extensive comments in writing in the days following the oral presentations. As we noted in *Cerrillos Gravel Products, Inc. v. Board of Commissioners of Santa Fe County*, 2005-NMSC-023, ¶ 28, 138 N.M. 126, 117 P.3d 932, "[i]n administrative proceedings due process is flexible in nature and may adhere to such requisite procedural protections as the particular situation demands." (internal quotation marks and citation omitted). In *Cerrillos Gravel*, we suggested in dicta that a two-minute time limit on total input before an administrative body could possibly raise due process concerns. *Id.* ¶¶ 3, 28. Unlike the situation in *Cerrillos Gravel*, however, the Rayellen parties were permitted to supplement their oral presentations with written comments, and there is nothing in the record to suggest that they were unable to present all relevant input in one form or the other.

**{55}**     Accordingly, we hold that the Committee provided adequate due process in apprising interested parties of the pending action and affording them an opportunity to present their input.

**{56}**     Fifth, the Rayellen parties argue an issue on which the district court did not rule: that the listing should be reversed because the Committee never voted on the permanent nomination in its final form. At the June 5, 2009, meeting, the State Historic Preservation Officer merely gave a summary presentation on the Mount Taylor listing, which the Committee then passed by a unanimous voice vote. The Committee followed with its written final order on September 14, 2009. The Rayellen parties' theory is that the Committee's final

order was a "post hoc rationalization" and that Committee members had to actually draft the final order prior to voting for it to be legally acceptable, relying on 4.10.3.14(E) NMAC ("At a regular meeting, no member of the [C]ommittee may participate in a final decision in any matter before the [C]ommittee unless he has heard the evidence or has been present for the discussion prior to such decision. Further, *such member must be present at said meeting for actual participation in the final decision . . . .*" (emphasis as added by the Rayellen parties)).

**{57}** The plain language of 4.10.3.14(E) NMAC requires only that a Committee member hear the evidence or be present for the discussion prior to voting on a final decision. Nothing in the law requires the Committee to draft a final order prior to voting on that form of order. Accordingly, the Rayellen parties' argument that the final order fails to reflect the Committee's vote is without merit.

**{58}** Sixth, the Rayellen parties make another argument on which the district court did not rule: that the Committee's final order incorrectly indicates a total of 434,767 acres instead of 344,828 acres of contributing lands and that the listing is therefore arbitrary and capricious. There is nothing in the record to suggest that the Committee's failure to exclude nearly 90,000 acres of noncontributing property from the computed total acreage of the listing was anything but a clerical error. Although there is no specific rule on clerical mistakes for administrative agencies, our district court rules recognize that "[c]lerical mistakes in judgments, orders, or parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." Rule 1-060(A) NMRA; *accord State v. Hill*,1918-NMSC-046, ¶ 2, 24 N.M. 344, 171 P. 790 ("Where the sense of an indictment is clear, nice or technical exceptions are not to be favorably regarded; therefore verbal inaccuracies, or clerical errors which are explained and corrected by necessary intendment from other parts of the indictment, are not fatal."). Because the computational error on the total acreage is correctable and is neither fraudulent nor fatal to the overall intent of the order, we conclude that the Rayellen parties' argument is without merit.

**{59}** Finally, the Rayellen parties argue that the listing violates constitutional protections against the establishment of religion based on *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *adopted by this Court in Pruey v. Dep't of Alcoholic Beverage Control of N.M.*, 1986-NMSC-018, ¶ 12, 104 N.M. 10, 715 P.2d 458, because the purpose of the listing is primarily and impermissibly religious.

**{60}** *Lemon* establishes that a government action is not violative of the Establishment Clause of the First Amendment to the United States Constitution if it passes a three-part test: "First, [the government action] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [government action] must not foster 'an excessive government entanglement with religion.'" *Id.* at 612-13 (citation omitted). Here, a whole record review shows that (1) ample evidence exists for listing Mount Taylor as a historical site, including the area's documented

20

archaeological and cultural significance, (2) the primary effect of the listing is to promote historic preservation, not to advance religion, and (3) the listing does not foster excessive government entanglement in religion; the listing merely requires interagency consultation on acts that may have an adverse effect on the historic site. Accordingly, we hold that the Mount Taylor listing does not violate the Establishment Clause under *Lemon*, the same conclusion reached by the district court.

## IV. CONCLUSION

{61} We reverse the district court in part by holding that the decision of the New Mexico Cultural Properties Review Committee to list Mount Taylor as a cultural property under the New Mexico Cultural Properties Act did not violate due process guarantees or statutory requirements on inspection, maintenance, and integrity. We affirm the district court in part in our holding that the Cebolleta Land Grant common lands are not state land for purposes of the Cultural Properties Act, in our rejection of claims that the listing violates protections against the establishment of religion, and in our rejection of other arguments raised in the Rayellen parties' cross-appeal. We remand the case to the district court with instructions to amend its judgment in conformity with this opinion.

{62} **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for *Rayellen Res., Inc. v. N.M. Cultural Props. Review Comm.*, No. 33,497**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Appeal
Arbitrary and Capricious Actions

Due Process
Hearings
Judicial Review
Notice
Standard of Review

**APPEAL AND ERROR**
Certification
Standard of Review

**CIVIL PROCEDURE**
Standing

**CONSTITUTIONAL LAW**
Due Process
Establishment of Religion

**MISCELLANEOUS STATUTES**
Cultural and Properties Act

**PROPERTY**
Land Grants
Mineral Resources

**STATUTES**
Interpretation
Legislative Intent